# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DISTRICT

ARMANDO BENAVIDEZ,

              Petitioner,              CASE NO. 07-cv-14480

v.                                 JUDGE PAUL D. BORMAN
                                 UNITED STATES DISTRICT JUDGE

JERI-ANN SHERRY,

              Respondent.

_____/

## OPINION AND ORDER
## (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, (2) DECLINING TO
## ISSUE A CERTIFICATE OF APPEALABILITY, (3) AND DENYING
## AN APPLICATION FOR LEAVE TO PROCEED ON APPEAL *IN FORMA PAUPERIS*

Petitioner Armando Benavidez, a state inmate currently incarcerated at the Alger

Correctional Facility in Munising, Michigan,[1] filed a *pro se* petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254, alleging that he is incarcerated in violation of his constitutional rights.

In his *pro se* pleadings, Petitioner challenges his convictions for first-degree premeditated murder,

MICH. COMP. LAWS § 750.316a(2), and carrying a dangerous weapon with unlawful intent, MICH.

COMP. LAWS § 750.226. He was sentenced, as a habitual offender, to life in prison for the first-

degree murder conviction, and three years eleven months to seven years six months in prison for the

weapons conviction, to be served concurrently. For the reasons stated below, the Court will deny

---

[1]Petitioner was incarcerated at the Chippewa Correctional Facility when he originally filed his habeas petition; however, he has since been transferred to the Alger Correctional Facility. The proper respondent in a habeas case is the habeas petitioner's custodian, which in the case of an incarcerated petitioner is the warden of the facility where the petitioner is incarcerated. Rule 2(a) of the Rule Governing § 2254 Cases; *see also Edwards v. Johns*, 450 F.Supp.2d 755, 757 (E.D. Mich. 2006). In most cases where a petitioner is transferred to a different facility after the petition has been filed, the Court would order an amendment of the case caption. However, because the Court is denying the petition in this case, it finds no reason to do so.

the petition. The Court will also decline to issue Petitioner a certificate of appealability and will deny him an application for leave to proceed on appeal *in forma pauperis*.

## I.    BACKGROUND

This case arises because of a shooting that occurred on July 25, 2002, which resulted in the death of Arthur (A.J.) Emerson. Trial began on May 13, 2003 and concluded on May 15, 2003.

Carol Pyscher was first to testify. She testified that A.J. Emerson was working in his yard on that day. She said she was sitting on the porch with her mother, two houses away, when she saw him cross the street to go to a neighbor's house to borrow a saw. Pyscher said she then saw a green car approach Emerson as he was returning to his home. Words were exchanged. Emerson told the driver to slow down. The driver, later identified as Racquel Benavidez, stopped the car, got out and approached Emerson, screaming and swearing at him. Pyscher said Racquel shoved Emerson. Emerson told Racquel "to get back in the car or you will get hit." Trial Tr. vol. II, 41, May 14, 2003. Raquel returned to her car. Pyscher said Emerson then punched the passenger-side window. The car then sped away.

Pyscher further testified that she then asked Emerson what was going on. She said he was upset and visibly shaking. He told her that he didn't know the people. About five or ten minutes later, Pyscher said she saw the car come around the corner and pull up onto her mother's property. She saw Petitioner get out of the car and charge toward Emerson. Pyscher saw Petitioner chase Emerson. She said she lost sight of them as they ran back through a neighbor's yard. Pyscher said a lady and a young man then jumped out of the car, both running in different directions. The lady said, "I'm going to run around here, and you go that way, and we will try to catch him through the back." Trial Tr. vol. II, 47, May 14, 2003.

2

Joe Benavidez, Petitioner's nephew, was a passenger in the car. He testified that his Aunt Raquel was driving the car on that day when they encountered Emerson. He said she came close to hitting him with the car. Raquel began swearing at Emerson, and according to Joe, she got out of the car where they "had a few words swearing." Trial Tr. vol. II, 68, May 14, 2003. According to Joe, Racquel pushed Emerson. He said Emerson was carrying a saw. Emerson then laid the saw on the ground and slapped Racquel. When Raquel got back in the car, Emerson punched at the passenger window. Joe testified that Racquel was upset that she got slapped and she said she was "going to get her brother to f--- him up." Trial Tr. vol. II, 71, May 14, 2003.

When Raquel arrived at the home of a relative, she told her brother, and the others that were at the house, what had happened. Raquel, Petitioner, Joe and three other people, Valentino Torrez, Rudy Fitchett, and Maria Valez, then returned to the scene.

Joe further testified that, as they drove to the location, Petitioner was holding his fold-out knife. The knife had a 5-inch blade, with teeth along the edge, and he was twirling the knife in his hands. When they drove up to the yard where Emerson was standing, Joe saw Petitioner and Torrez get out of the car. Petitioner popped the knife open and chased Emerson. Joe said he and the others drove around looking for Petitioner. When they spotted him, Joe said he was by a house, two blocks from where the chase began. Joe testified that Petitioner's arms were moving, "[l]ike stabbing somebody," about five or six times. Trial Tr. vol. II, 87-88, May 14, 2003. Emerson was on his back and Petitioner was on top of him. Joe said Petitioner then got back into the car.

Dr. Valery Alexandrov, the forensic pathologist who performed Emerson's autopsy, testified that Emerson died from multiple stab wounds, a total of seven. Due to the stab wounds "he bled to death." Trial Tr. vol. II, 130, May 14, 2003. The wounds included a deep stab wound to the face

and neck, two stab wounds in the back, and two to the chest. Dr. Alexandrov said there were two wounds on Emerson's hands; one was a cut that appeared to be a defense-type wound. Dr. Alexandrov testified that the type of injuries she found on Emerson's chest, face, and neck area required "quite a lot of force, quite a lot of force," and she said the knife blade causing the injuries must have been at least five or six inches long. Trial Tr. vol. II, 139, May 14, 2003.

Racquel Benavidez, Petitioner's sister, testified next. She said that she was driving to the store, with her nephew Joe, when this man, Emerson, was crossing the street. She almost hit him. Racquel testified that Emerson and her nephew started arguing. Racquel said she then got out of the car and started arguing with Emerson. She said he pushed her and she pushed him back and then got back in the car. Emerson then punched the passenger window.

Racquel further testified that she then drove back to the house. She said she was crying and upset. She told the others that some kid hit her. They all then got back in the car, Racquel, Petitioner, Maria Valez, Valentino Torrez, Rudy Fitchett, and Joe. Maria was driving the car.

Racquel testified that when they got back to area where the altercation occurred, they saw Emerson. She said Petitioner got out of the car and started chasing him, along with Maria and Rudy. She saw Emerson trip over a "wading pool, and then he was laying down and I seen (sic) my brother stab him." Trial Tr. vol. II, 167, May 14, 2003.

Rudy Fitchett, who was also in the car that day, testified. He said Petitioner was in the car holding a knife. Fitchett said Petitioner then jumped out of the car and started chasing Emerson. He testified that, after the chase and stabbing, Petitioner acknowledged killing the guy and threatened "to kill everybody if they say (sic) anything about the stabbing." Trial Tr. vol. II, 231, May 14, 2003.

4

Additional witnesses to the stabbing included three young men who knew Emerson, Courtney Nash, Andrew Laski, and James Haney. The young men were sitting on the porch when they saw Emerson running toward them, Petitioner following him. Emerson said, "help me, this dude is chasing me with a knife." Trial Tr. vol. II, 180, 202, 212, May 14, 2003. They saw the knife in Petitioner's hand. They testified that the chase continue until Emerson tripped. One of the young men saw Emerson on his hands and knees, after he tripped. Petitioner jumped on Emerson's back and started stabbing hm. Petitioner stabbed Emerson at least twice in the back, and when Emerson rolled over trying to fight to get him off, Petitioner continued to stab him. Petitioner then ran behind the house and jumped a fence. One of the three young men then called an ambulance, while the other two tried to stop Emerson's bleeding.

Petitioner's only witness was Detective Carlson, who was questioned by defense counsel about his interviews with witnesses Joe Benavidez and Rudy Fitchett. On cross-examination, the prosecutor asked the Detective if he spoke to Petitioner. Detective Carlson indicated Petitioner was taken down to the Department, was given his *Miranda*[2] rights and was not questioned, but voluntarily stated, "I'm just here because I went into the gas station," that he "did not know Saginaw," and that "if we had anything on him, he would not be sitting here, referring to sitting in the police department. Trial Tr. vol. III, 40, May 15, 2003.

Defense counsel requested a mistrial on the basis of the questions and answers that were elicited from Detective Carlson, specifically the questions about Petitioner's *Miranda* rights. The trial judge denied the motion.

---

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

The jury received instructions on both first-degree and second-degree murder. Defense counsel requested an instruction for a lesser-offense of voluntary manslaughter, but the trial judge denied the request.

After a three-day jury trial, Petitioner was convicted and sentenced as stated.

Following his sentencing, Petitioner filed an appeal of right with the Michigan Court of Appeals, alleging:

I. The prosecutor failed to introduce sufficient evidence of premeditation and deliberation to support the conviction for first-degree murder. [Petitioner] is entitled to a reversal of the conviction.

II. The trial court erred whe[n] it denied [Petitioner's] request for an instruction on manslaughter. The trial court denied [Petitioner] his constitutional right to a properly instructed jury. The conviction should be reversed.

III. The prosecutor asked Detective Carlson about [Petitioner's] statement or lack thereof. The [D]etective commented on the fact that [Petitioner] did not make a statement. The trial court abused its discretion whe[n] it denied the [Petitioner's] motion for a mistrial. The trial court violated [Petitioner's] Fifth Amendment rights and the conviction should be reversed

The Michigan Court of Appeals affirmed Petitioner's convictions and sentences. *People v. Benavidez*, No. 249415, 2004 WL 1778797 (Mich.Ct.App. Aug. 10, 2004). Subsequently, Petitioner filed an application for leave to appeal that decision with the Michigan Supreme Court, raising the same claims raised in the Court of Appeals and adding the following:

I. The prosecutor used a prison photograph of [Petitioner's] physique to influence the jury. The photograph had no probative value and caused prejudicial effects. [Petitioner's] conviction should be reversed

On March 29, 2005, the Michigan Supreme Court denied the application because the "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Benavidez*, 472 Mich. 879, 693 N.W.2d 817 (2005).

Following, Petitioner filed a motion for relief from judgment in the trial court, pursuant to Michigan Court Rule 6.500 *et. seq.*, alleging: (1) the trial court erred in admitting into evidence a photograph of him that was highly prejudicial and not probative, (2) trial counsel was ineffective in failing to object to introduction of the photograph, and (3) appellate counsel was ineffective in failing to raise the issues regarding the photograph in his direct appeal. On March 7, 2006, the trial court denied the motion. *People v. Benavidez*, No. 02-022148-FC-3 (Saginaw County Circuit Court, Mar. 7, 2006).

Petitioner filed a delayed application for leave to appeal the trial court's decision with the Michigan Court of Appeals, alleging:

I.      The trial judge abused her discretion when she allowed the prosecution to enter into evidence an inflammatory photograph of [Petitioner] that had no bearing on a material matter "in issue."

II.     [Petitioner] was denied the effective assistance of trial counsel.

III.    [Petitioner] was denied the effective assistance of counsel on direct appeal when appellate counsel failed to raise, for appellate review, the issues presented in [the] motion [for relief from judgment].

On March 30, 2007, the Court of Appeals denied Petitioner's delayed application "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Benavidez*, No. 271896 (Mich.Ct.App. Mar. 30, 2007). On July 30, 2007, the Michigan Supreme Court denied his application for the same reason. *People v. Benavidez*, 479 Mich. 867, 735 N.W.2d 281 (2007).

On October 22, 2007, Petitioner filed the pending habeas petition, raising the following claims:

I.      The prosecutor failed to introduce sufficient evidence of premeditation and deliberation to support the conviction for first-degree murder.

II.     The trial court erred where it denied [Petitioner's] request for an instruction

on manslaughter. The trial court denied [Petitioner] his constitutional right to a properly instructed jury.

III.     The prosecutor asked Detective Carlson about [his] statement or lack thereof. The Detective commented on the fact that [Petitioner] did not make a statement. The trial court abused its discretion where it denied [Petitioner's] motion for a mistrial. The trial court violated [his] Fifth Amendment rights.

IV.     The trial judge abused her discretion when she allowed the prosecution to enter into evidence an inflammatory photograph of [Petitioner] that had no bearing on a material matter "at issue."

V.     [Petitioner] was denied the effective assistance of trial counsel.

VI.     [Petitioner] was denied the effective assistance of counsel on direct appeal when appellate counsel failed to raise for appellate review the issues presented in this petition.

## II.     ANALYSIS

### A.     Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this Court's habeas corpus review of state-court decisions. Under the AEDPA, a federal court's review of a habeas proceeding is limited. A federal court may not grant a writ of habeas corpus unless the state adjudication on the merits either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

28 U.S.C. § 2254(d).

The Supreme Court clarified that standard in *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000):

Under the "contrary to" clause, a federal habeas court may grant the writ if the state

court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

With that standard in mind, the Court proceeds to address Petitioner's claims.

## B. Insufficient Evidence Claim

In his first habeas claim, Petitioner alleges that, although he admitted to stabbing the victim, the prosecution failed to show that he acted with premeditation and deliberation. The Michigan Court of Appeals, the last court to issue a reasoned decision on this issue, considered and rejected Petitioner's claim, stating:

> Defendant first argues that there was insufficient evidence regarding premeditation and deliberation to support his first-degree murder conviction. We disagree. We review claims of insufficient evidence de novo. When reviewing a challenge to the sufficiency of the evidence, we examine the evidence in a light most favorable to the prosecution to determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt.

> "In order to convict a defendant of first-degree murder, the prosecution must prove that the defendant intentionally killed the victim and that the act of killing was premeditated and deliberate." "Premeditation and deliberation require sufficient time to allow the defendant to take a second look." "The elements of premeditation and deliberation may be inferred from the circumstances surrounding the killing. "Though not exclusive, factors that may be considered to establish premeditation include the following: (1) the previous relationship between the defendant and the victim; (2) the defendant's actions before and after the crime; and (3) the circumstances of the killing itself, including the weapon used and the location of the wounds inflicted." Additionally, defensive wounds suffered by a victim can be evidence of premeditation.

> Here, a finding of premeditation and deliberation was supported by the circumstances surrounding the killing. Although there was no evidence of a prior relationship between defendant and the victim, premeditation and deliberation may be inferred from the other facts and circumstances surrounding the incident. Defendant's sister and the victim were involved in an altercation. Upon learning this, defendant and five others returned to the scene of the incident. On the way,

defendant was twirling a fold-out knife with a five-inch blade in his hand, and stated that he was going to "f--- [the victim] up." Upon arriving at the scene, defendant got out of the car, opened the knife, and chased the victim. The victim tripped on a wading pool and defendant jumped on top of him, stabbing him twice in the back. The victim rolled over and tried to defend himself, but defendant inflicted five additional stab wounds, causing the victim to bleed to death. Afterwards, defendant acknowledged killing the victim, and threatened "to kill everybody if they say anything about the stabbing." Viewing the evidence in a light most favorable to the prosecution, we conclude that there was sufficient evidence for a reasonable jury to find that defendant acted with the requisite premeditation and deliberation.

*Benavidez*, 2004 WL 1778797, at *1-2 (citations omitted).

In reviewing a habeas petitioner's claim that the evidence was insufficient to convict him, a federal court is "bound by two layers of deference to groups who might view facts differently than" the Court would. *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). First, as in all sufficiency of evidence challenges, a court "must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original)). "In doing so, [the Court does] not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *Id.* ( citing *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993)). Therefore, even if a federal habeas court might have not convicted the defendant had it been the factfinder in the state court, it must uphold the verdict if any rational trier of fact could have found the defendant guilty after resolving all factual disputes in favor of the prosecution. Second, even if a federal habeas court concludes that a rational trier of fact could not have found a habeas petitioner guilty beyond a reasonable doubt, on habeas review, the Court "must still defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable." *Brown*, 567 F.3d at 205 (emphasis in the original); *see also Tucker v. Palmer*, 541 F.3d 652, 666 (6th Cir. 2008) (same), *cert. denied* ---

U.S. ----, 130 S.Ct. 109 (2009) (citing 28 U.S.C. § 2254(d)(1)).

In the instant case, the Michigan appellate courts properly upheld Petitioner's murder conviction. As the Court of Appeals noted, to prove first-degree murder, the prosecution must show that Petitioner "intentionally killed the victim, and that the act of killing was premeditated and deliberate." *People v. Kelly*, 231 Mich.App. 627, 641, 588 N.W.2d 480 (1998) (citing *People v. Anderson*, 209 Mich.App. 527, 537, 531 N.W.2d 780 (1995)). The interval between the initial thought and the ultimate killing should be long enough to afford a reasonable person time to take a "second look." *Id.* Moreover, intent and premeditation may be inferred from the facts and circumstances including a defendant's actions before and after the crime, the circumstances of the killing, including the weapon involved, and the location of the wounds inflicted. *People v. Plummer*, 229 Mich.App. 293, 300, 581 N.W.2d 753 (1998).

Here, testimony established that Petitioner's sister and the victim, Emerson, had an altercation near Emerson's home where Ms. Benavidez was driving. Petitioner was not at the scene during the altercation. Eyewitnesses testified that the victim had done nothing to trigger the confrontation with Ms. Benavidez. Rather, Petitioner indicated to her that she needed to slow down, at which point Ms. Benavidez got out of her car and approached Emerson, screaming and swearing at him. Emerson was not aggressive with her, but when she shoved him, he pushed her back. When she went back to her car, Emerson punched at the passenger window of the car but no damage resulted and Ms. Benavidez sped away.

Petitioner's nephew, who was with Ms. Benavidez in the car, and, who was also present when Petitioner returned to the neighborhood, testified that his aunt was upset after the initial

altercation and said that she was going to get her brother. When Ms. Benavidez arrived at the home of a relative, she told Petitioner what happened and then she, Petitioner, the nephew, and three other people returned to the scene. Petitioner was holding his fold-out knife that had a 5-inch blade with teeth along the edge, and was twirling the knife in his hands. When they arrived, Emerson was standing and talking with neighbors when Petitioner got out of the car, popped open his knife, and started chasing him. The next time the nephew saw Petitioner, he was two blocks away and straddling Emerson, who was lying on the ground on his back. Petitioner's arms were moving, as though he was "stabbing somebody."

Fitchett, who was in the car with Petitioner and the others, also testified that Petitioner was holding a knife. He also saw Petitioner run from the car and chase Emerson. And, when Petitioner ultimately returned back to the car, he acknowledged that he killed Emerson and threatened to kill the others if they said anything about the stabbing.

Three young men, who were eyewitnesses, testified that they saw Petitioner chasing Emerson. Emerson asked them for help and told them that the man chasing him had a knife. They then saw the knife in Petitioner's hand. The chase continued until Emerson fell. He was on his hands and knees when Petitioner jumped on his back and started stabbing him. When Emerson rolled over and tried to fight Petitioner, Petitioner continued to stab him. Once Petitioner was done, he ran behind a house and jumped a fence. They called 911, but Emerson lost consciousness before help arrived.

Given that evidence, the jury rationally concluded that Petitioner acted with premeditation and deliberation when he consciously returned to the neighborhood where the altercation had occurred. Petitioner went to the location armed with a knife. The victim was not only unarmed at

the scene, but also attempting to flee until he tripped. Petitioner elected to not only chase an unarmed victim, but once he caught him he did not hit or punch him, but instead stabbed him in the back twice. And, as the victim rolled over and attempted to defend himself, Petitioner stabbed him five more times.

At each point in this sequence of events, Petitioner had sufficient time to take a second look at his actions. He could have elected not to go to the location. Once he decided to go there, he could have decided he would go unarmed. Once he decided to go there armed, he could have decided not to chase the victim as he fled away. Once he decided to chase the victim, and once he caught him, he could have elected to verbally confront the victim or engage in physical confrontation without using a deadly weapon. Once he decided to stab the victim twice in the back, he could have stopped. Rather, Petitioner continued to stab the victim five more times.

Because there was overwhelming and compelling evidence for the jury to find beyond a reasonable doubt that Petitioner committed first-degree murder, the state appellate courts' resolution of this claim was not unreasonable, or contrary to, clearly established Supreme Court precedent. The Court therefore concludes that Petitioner is not entitled to habeas relief regarding this claim.

### C.    Jury Instruction Claim

In his second habeas claim, Petitioner alleges that the trial court erred when it denied his request for an instruction on manslaughter. The Michigan Court of Appeals, in addressing this claim, stated:

> Defendant next argues that the trial court erred by failing to grant his request for a voluntary manslaughter instruction. We disagree. We review claims of instructional error de novo. However, our Supreme Court has held that harmless error analysis is applicable to instructional errors involving necessarily included lesser offenses. Voluntary manslaughter is a necessarily included lesser offense of murder. Therefore, "an instruction is warranted when a rational view of the evidence

13

would support it."

> "[T]o show voluntary manslaughter, one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions." "[T]he element distinguishing murder from manslaughter – malice – is negated by the presence of provocation and heat of passion." Moreover, "[t]he provocation must be adequate, namely, that which would cause [a] reasonable person to lose control." Here, a rational view of the evidence did not support an instruction on voluntary manslaughter. Defendant did not know the victim, and had never come into contact with him before the incident. Instead, after finding out that his sister had been involved in an altercation with the victim, defendant returned to the scene of the altercation with a knife within five to ten minutes, chased the victim down, and stabbed him several times. There was no evidence that defendant was provoked by the victim in any way, such that would cause a reasonable person to lose control. Therefore, an instruction on voluntary manslaughter was not supported by the evidence, and the trial court did not err in declining to instruct the jury on that offense. [Additionally, we note that "where a defendant is convicted of first-degree murder, and the jury rejects other lesser included offenses, the failure to instruct on voluntary manslaughter is harmless." Here, the jury rejected a verdict of second-degree murder; therefore, any error in failing to instruct the jury on voluntary manslaughter would be considered harmless in any event.]

*Benavidez*, 2004 WL 1778797, at *2 (citations omitted).

Habeas corpus is available only if a petitioner is in state custody in violation of the federal Constitution or laws. 28 U.S.C. § 2254(a). The federal courts have no power to intervene on the basis of a perceived error of state law. *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *see also Sanford v. Yukins*, 288 F.3d 855, 860 (6th Cir. 2002) ("State law means what the state courts say it means. A claim that the state court misunderstood the substantive requirements of state law does not present a claim under § 2254.") (citing *Bates v. McCaughtry*, 934 F.2d 99, 102 (7th Cir. 1991)). Within broad constitutional limits, a state has discretion to determine the elements of its own crimes, what proofs are essential to establish the elements of those crimes, and the available defenses. *See Patterson v. New York*, 432 U.S. 197, 210 (1977); *Sanford* , 288 F.3d at 861; *Warner v. Zent*, 997 F.2d 116, 133 (6th Cir. 1993). On habeas review, the federal courts are bound by the state courts'

interpretation of their own laws. *Mullaney v. Wilbur*, 421 U.S. 684, 690-91 (1975); *Warner*, 997 F.2d at 133. "The fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 71 (1991); *accord Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("To the contrary, we have held that instructions that contain errors of state law may not form the basis for federal habeas relief.").

The United States Court of Appeals for the Sixth Circuit, sitting en banc, has held that the failure to give an instruction on a lesser-included offense, even when requested by counsel, is not of the "character or magnitude which should be cognizable on collateral attack." *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990). The *Bagby* Court held that failure to instruct on lesser-included offenses in a non-capital case is reviewable in a habeas corpus action only if the failure results in a miscarriage of justice or constitutes an omission inconsistent with the rudimentary demands of fair procedure. *Id.*; *accord Tegeler v. Renico*, 253 Fed.App'x 521, 524 (6th Cir. 2007) (holding that, in a murder case, due process does not require a jury instruction on the lesser included offense of voluntary manslaughter); *Scott v. Elo*, 302 F.3d 598, 606 (6th Cir. 2002) (involuntary manslaughter instruction not required by due process); *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001) (voluntary manslaughter instruction not required); *Samu v. Elo*, 14 Fed.App'x 477, 479 (6th Cir. 2001) (same). "[N]o clearly established Supreme Court authority requires lesser-included-offense instructions in non-capital cases." *Samu*, 14 Fed.App'x at 479.

As the Michigan Court of Appeals determined, a manslaughter instruction was not warranted because it was not supported by the evidence presented at trial. To show voluntary manslaughter in Michigan, a prosecutor must prove that a defendant killed in the heat of passion, that the passion was caused by adequate provocation, and that there was no lapse of time during which a reasonable

person could control his passions. As discussed more fully *infra*, Petitioner was never provoked in any way by the victim. Instead, he elected to go to a neighborhood where his sister had been in an altercation. And, he chose to do so while armed with a knife. Moreover, even if Petitioner could demonstrate adequate provocation and heat of passion, he cannot overcome the overwhelming evidence that established there were lapses of time during which he could have stopped his actions, yet he elected not to do so.

Petitioner also fails to overcome the finding by the Court of Appeals that, even if there was instructional error, it was harmless per se because in Michigan, "where a defendant is convicted of first-degree murder, and the jury rejects other lesser included offenses, the failure to instruct on voluntary manslaughter is harmless." *People v. Sullivan*, 231 Mich.App. 510, 520, 586 N.W.2d 578 (1998) (citing *People v. Beach*, 429 Mich. 450, 481, 490-491, 418 N.W.2d 861 (1988); *People v. Zak*, 184 Mich.App. 1, 16, 457 N.W.2d 59 (1990)). Here, the jury unquestionably rejected a verdict of second-degree murder, thus, any alleged instructional error was harmless. Petitioner is therefore not entitled to habeas relief regarding this claim

### D.        Right to Remain Silent Claim

In Petitioner's third habeas claim, he alleges that his Fifth Amendment rights were violated when the trial court denied his motion for a mistrial after the prosecutor asked Detective Carlson about his statement, or lack thereof, and Detective Carlson then commented on the fact that he did not make a statement. The Michigan Court of Appeals considered, and rejected, this claim because the prosecutor's questions and Detective Carlson's answers did not address Petitioner's silence or any failure to make a statement:

Finally, defendant argues that the trial court abused its discretion when it denied his motion for a mistrial based on the prosecutor's allegedly improper comment on his right to remain silent. The dialogue of which defendant complains stems from questions posed by the prosecutor to a detective regarding statements volunteered by defendant after being read his *Miranda* rights. We review the grant or denial of a motion for mistrial for an abuse of discretion. An abuse of discretion exists only where denial of the motion deprived the defendant of a fair and impartial trial. Additionally, we review properly preserved claims of prosecutorial misconduct de novo, examining the pertinent portion of the record and evaluating a prosecutor's remarks in context to determine whether the defendant was denied a fair and impartial trial.

It is well settled that when a defendant exercises his right to remain silent, that silence may not be used against him at trial. However, in the instant case, defendant did not exercise his right to remain silent after being advised of his *Miranda* rights. Rather, after being advised of his right to remain silent, and without being asked any questions, defendant voluntarily stated that he was only in custody because he went into a gas station, that he was not familiar with the city where the crime occurred, and that if the police "had anything" on him, he would not be sitting in the police department. The prosecutor elicited testimony to that effect from the detective, and defense counsel moved for a mistrial on the basis that the prosecutor improperly commented on defendant's silence. The prosecutor responded that his questions and the detective's answers were not improper, because defendant voluntarily made the statements after being advised of his right to remain silent. Accordingly, the trial court denied defendant's motion for a mistrial.

We conclude that the prosecutor's questions and the detective's answers were not improper comments on defendant's right to remain silent. The prosecutor's questions did not address defendant's silence or any failure to make a statement. Defendant chose to speak, and the prosecutor inquired as to defendant's statements to the police to highlight the discrepancy between what defendant initially told the police and the defense theory of the case put forward at trial. "Where a defendant makes statements to the police after being given *Miranda* warnings, the defendant has not remained silent, and the prosecutor may properly question and comment with regard to the defendant's failure to assert a defense subsequently claimed at trial." Moreover, the trial court did not abuse its discretion in denying defendant's motion for a mistrial on this basis.

*Benavidez*, 2004 WL 1778797, at *3 (citations omitted).

In *Miranda*, the United States Supreme Court held that police are required to advise a suspect

of the right to remain silent before conducting a custodial interrogation. The Court has also held,

in *Doyle v. Ohio*, 426 U.S. 610, 617-19 (1976), that use of a defendant's silence after receiving the

*Miranda* warnings for impeachment violates the Fourteenth Amendment, because advising of the right to remain silent implies that silence will not be used as incriminating evidence and because it would be unfair to penalize a defendant for simply exercising a constitutional right. The Fifth Amendment forbids comment by the prosecutor that a criminal defendant has invoked his constitutional rights. *Griffin v. California*, 380 U.S. 609, 615 (1965).

Petitioner contends that his right to remain silent pursuant to *Doyle* was violated when the prosecutor allegedly questioned the detective regarding his statements to or silence regarding questions from the police. Petitioner's contention is based on a misinterpretation of *Doyle* and a skewed recitation of the prosecutor's line of questioning.

Detective Carlson was called as a defense witness. Defense counsel's main focus of questioning concerned statements that witnesses Fitchett and Joe Benavidez provided. Defense counsel was attempting to impeach the testimony of both eyewitnesses through their statements to police. During cross-examination, the prosecutor asked Detective Carlson if he also talked to Petitioner, and if Petitioner was read his rights. Both questions were answered in the affirmative. When asked if Petitioner made any statements, Detective Carlson noted that, without being asked any questions, and after being advised of his *Miranda* rights, Petitioner voluntarily stated that he was just there because he went into the gas station, that he did not know Saginaw and that if they had anything on him, he would not be there, referring to sitting at the police department.

Voluntary statements of any kind are not barred by the Fifth Amendment. *Miranda*, 384 U.S. at 477-78. Here, Petitioner's statements were clearly voluntary and occurred after he was aware of his right to remain silent. Petitioner cannot cite to any portion of the trial record to support

18

his claim that the prosecutor used his right to remain silent against him. Indeed, the prosecutor never even commented on whether or not Petitioner remained silent. Rather, the prosecutor was merely discerning whether Petitioner made a statement, and with regard to any statements, what information if any Petitioner provided to police.

Petitioner did not remain silent, thus, he cannot plausibly argue that his silence was used against him, or that his constitutional rights were denied in any way. Therefore, he is not entitled to habeas relief regarding this claim.

### E. Claims IV through VI Are Procedurally Defaulted

Petitioner failed to seek direct review in both Michigan appellate courts with respect to his remaining habeas claims, claims IV through VI, evidence of an inflammatory photograph, ineffective assistance of trial counsel, and ineffective assistance of appellate counsel. Those claims were not raised in Petitioner's direct appeal to the Michigan Court of Appeals and the Michigan Supreme Court, except for claim IV, which was raised for the first time in his application for leave to appeal to the Michigan Supreme Court.[3] And, claims V and VI were raised for the first time in his motion for relief from judgment in the trial court as was claim IV. Following the denial of his post-conviction motion, the Michigan Court of Appeals and the Michigan Supreme Court, the last state courts rendering judgment on all of the claims, both denied relief on the grounds that Petitioner had failed to demonstrate entitlement to relief under Mich.Ct.R. 6.508(D).

---

[3]Petitioner raised that issue for the first time in his application for leave to appeal with the Michigan Supreme Court, after the Court of Appeals denied his direct appeal. Petitioner did not raise that claim in his direct appeal with the Court of Appeals. A petitioner does not preserve his state court remedies regarding a claim if the claim is presented for the first time to the state's highest appellate court for discretionary review, and the court declines to review the claim. *Castille v. Peoples*, 489 U.S. 346, 350-51 (1989).

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004) (citing *Seymour v. Walker*, 224 F.3d 542, 554-55 (2000) (citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)); *Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *House v. Bell*, 547 U.S. 518, 536 (2006); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence it is more likely than not that no reasonable juror would

have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

To determine whether Petitioner has been denied relief based on a procedural default, the

Court looks to the last "reasoned judgment rejecting the [federal] claim." *Ylst*, 501 U.S. at 803. The doctrine is applicable if "the last state court to review [the prisoner's] conviction 'clearly and expressly' relied on [the prisoner's] procedural default in its decision affirming the petitioner's conviction." *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994) (citing *Harris v. Reed*, 489 U.S. 255, 262-63 (1989). A state law procedural rule is adequate and independent when it was "firmly established and regularly followed" at the time of the asserted procedural default. *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)).

In *Burroughs v. Makowski*, 282 F.3d 410, 413-14 (6th Cir. 2002), the Sixth Circuit considered the form order used by the state appellate courts here and found that it presented a sufficient explanation that the ruling was based on the failure to comply with a state procedural rule. Where a state court denies relief on independent and adequate state procedural grounds, as the state courts did here, a prisoner may only obtain habeas review of such claims if he can establish "cause and prejudice" or that the failure to review the claims would result in a "fundamental miscarriage of justice." *Strickler v. Greene*, 527 U.S. 263 (1999).

Although Petitioner asserts that appellate counsel did not provide effective assistance given the failure to raise the additional claims in his appeal of right, that argument does not constitute sufficient cause to excuse the procedural default. In order for attorney error to constitute cause, it must rise to the level of ineffective assistance of counsel under the standard in *Strickland v. Washington*, 466 U.S. 668 (1984). A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

Under *Strickland*, first, a petitioner must show that his counsel's representation fell below

an objective standard of reasonableness. *Strickland*, 466 U.S. at 687-91. Second, the petitioner must show that there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. With regard to the performance prong of the inquiry, "[j]udicial scrutiny of counsel's performance must be highly deferential, and "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

Here, the issues appellate counsel did raise on direct appeal were well argued, and the Michigan Court of Appeals issued a thorough opinion addressing the issues. As the Supreme Court stated in *Jones v. Barnes*, 463 U.S. 745, 753 (1983), "[a] brief that raises every colorable issue runs the risk of burying good arguments – those that, in the words of the great advocate John W. Davis, 'go for the jugular' – in a verbal mound made up of strong and weak contentions." Petitioner is required to show that his appellate attorney was so thoroughly ineffective that defeat was "snatched from the jaws of victory." Petitioner is unable to demonstrate that appellate counsel was unreasonable in failing to assert the additional claims in the appeal of right, or had counsel asserted the additional claims, the results on appeal would have been different.

Habeas Claims IV through VI concern the same issue, namely, whether the trial court abused her discretion when she allowed the prosecution to enter into evidence an inflammatory photograph of Petitioner that had no bearing on a material matter in issue. Trial counsel failed to object to the introduction of the evidence, and appellate counsel failed to raise either issue in the direct appeal. With regard to the photograph, the trial court specifically noted, in its order denying Petitioner's motion for relief from judgment, the details the picture contained. Namely, Petitioner is in the

photograph, clad in blue jeans and standing shirtless with his hands spread apart, facing the camera. Petitioner is standing in a room with a white or beige wall, which appears to contain a light switch, electric outlet and possibly a thermostat. Part of a doorway is visible, and Petitioner's body language and facial demeanor appear to be unremarkable and are not menacing in any way. The photograph was admitted at trial during the testimony of Petitioner's sister, who said Petitioner was a big guy and a strong guy. Petitioner's sister testified that the picture fairly depicted the way Petitioner looked at the time of the offenses charged.

As the trial court observed in its post-conviction order, the prosecution at trial had the burden of proving intent on the part of Petitioner. It was 'only logical, and eminently reasonable, that a person of physical strength would be more likely to form an intent to kill another person when he actually possessed the physical strength to carry out such a plan." *Benavidez*, No. 02-022148-FC-3, at *2. Accordingly, the photograph was probative.

Petitioner fails to articulate how the photograph was prejudicial in any way. Although Petitioner states over and over that the photograph was highly prejudicial and had no probative value, his mere assertions that it is so are not sufficient to demonstrate that, in fact, the photograph was objectionable. Petitioner claims that the picture depicted him in prison and thus was prejudicial. As the circuit court noted however, there is nothing in the photograph to indicate Petitioner was incarcerated at the time, because the photograph could have been taken at any location, and Petitioner's demeanor in the photograph was not menacing. *Benavidez*, No. 02-022148-FC-3, at *2.

Given the context of the photograph at issue, Petitioner cannot show that appellate counsel was ineffective for failing to challenge on direct appeal its admission into evidence. Nor can he demonstrate that, had appellate counsel asserted this issue, the results on appeal would have been

different. Several eyewitnesses, including members of Petitioner's own family as well as his friends, testified that Petitioner went to the scene with a knife and when he arrived chased down the unarmed victim until the victim fell down. Eyewitnesses saw Petitioner stab the victim twice, and when the victim turned over and tried to defend himself, Petitioner stabbed him five more times. Petitioner has not shown that, had his photograph not been admitted at trial, he would have been acquitted. Thus, he cannot establish any cause to excuse his procedural default of habeas claims IV through VI.

If a petitioner fails to establish cause for a procedural default, the court need not determine whether prejudice occurred because both are necessary to excuse a procedural default. *Murray v. Carrier*, 477 U.S. 478, 494-95 (186). When a petitioner fails to establish cause and prejudice for a procedural default, relief may be granted only if the petitioner can show that refusal to hear his claims will result in a fundamental miscarriage of justice. *Id.* at 495. The miscarriage of justice exception is a narrow one, seldom to be used. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). In order to invoke this narrow exception, a petitioner is required to show that a constitutional violation has probably resulted in the conviction of one who is actually innocent. *Id.* Such a claim requires a petitioner to support his allegations of constitutional error with new reliable evidence of his actual innocence of the crime for which he is imprisoned. *Id.* Petitioner has made no argument and presents no new evidence to show that he is actually innocent of the crime for which he is in custody.

This Court cannot grant relief to Petitioner on his procedurally-barred claims because he has failed to demonstrate cause and prejudice and has failed to make a showing of actual innocence "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied

that the trial was free of non-harmless constitutional error." *Schlup*, 513 U.S. at 316. Accordingly, Petitioner's habeas claims IV through VI are procedurally barred.

### F.    Certificate of Appealability

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition. Instead, [the] petitioner must first seek and obtain a [certificate of appealability.]" *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U .S.C. § 2253(c)(2).

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong . . . . When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court concludes that reasonable jurists would not find its assessment of Petitioner's first three claims debatable or wrong. Nor would reasonable jurists debate whether the Court's procedural-default ruling regarding his remaining claims was correct. The Court therefore declines to issue Petitioner a certificate of appealability and denies him an application for leave to proceed on appeal *in forma pauperis*.

## III.    CONCLUSION

Accordingly, **IT IS ORDERED** that the "Petition for Writ of Habeas Corpus" [dkt. # 1] is **DENIED**.

    **IT IS FURTHER ORDERED** that the Court declines to issue Petitioner a certificate of appealability and denies him an application for leave to proceed on appeal *in forma pauperis* because any appeal would be frivolous. *See* Fed.R.App.P. 24(a).


S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: July 22, 2010

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on July 22, 2010.


S/Denise Goodine
Case Manager